UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIONA RAYGOZA, et al., | 1:13-CV-00322-LJO-MJS |
| Plaintiffs, | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| v. | (Docs. 56) |
| CITY OF FRESNO, JERRY DYER, KENT PICHARDO, and DOES 1 – 50, | |
| Defendants. | |

### INTRODUCTION

Plaintiffs Fiona Raygoza, Isaiah Armenta (a minor by and through his mother, Candelaria Sanchez), Ivan Armenta (a minor by and through his mother, Candelaria Sanchez), Calah Armenta (a minor by and through her mother, Candelaria Sanchez), and Manuel Armenta, Jr. (a minor by and through his mother, Fiona Raygoza) (collectively, "Plaintiffs") bring this action for violation of 42 U.S.C. § 1983, wrongful death, and negligence against Defendants City of Fresno ("City"), Jerry Dryer, and Kent Pichardo (collectively, "Defendants"). Currently before the Court is Defendants' motion for summary judgment as to Plaintiffs' standing to bring their complaint and as to the complaint in its entirety. For the reasons discussed below, the Court DENIES Defendants' motion for summary adjudication as to Plaintiffs' standing, GRANTS Defendants' motion for summary adjudication as to Plaintiffs' federal claims, and DECLINES to exercise supplemental jurisdiction over and DISMISSES without prejudice Plaintiffs' state law claims.

1

# BACKGROUND

### A. Undisputed Facts Related to Standing

Plaintiff Raygoza purports to be the putative wife of Manuel Armenta, who died on May 8, 2012. Plaintiff Manuel Armenta, Jr. ("Armenta, Jr.") purports to be the son of Raygoza and the late Armenta, and was born six months after the death of Armenta. Plaintiffs Isaiah, Ivan, and Calah Armenta ("Isaiah," "Ivan," and "Calah," respectively) purport to be the children of Sanchez and Armenta.

In or around October 12, 2006, Raygoza married Carlos Camacho, her first husband. In or around September 10, 2010, Raygoza married Armenta. Raygoza and Armenta had a wedding ceremony. Neither party alleges, and there is no evidence to indicate, that either Raygoza or Camacho obtained a judgment of legal separation or divorce prior to Raygoza's marriage to Armenta. On November 2, 2010, Raygoza filed a petition for dissolution of her marriage to Camacho with Fresno County Superior Court. Raygoza had Armenta serve Camacho with the petition on November 10, 2010. Neither party alleges and there is no evidence to indicate that Fresno County Superior Court, or any other court, ever issued a judgment of dissolution as to Raygoza and Camacho's marriage. In March 2012, the Raygoza and Armenta discovered that Raygoza was pregnant. Armenta provided Raygoza with emotional support and accompanied her to doctor's visits throughout her pregnancy until Armenta's death. Raygoza gave birth to Armenta, Jr., on or around November 20, 2012. There is no DNA evidence as to Armenta, Jr.'s paternity.

Sanchez and Armenta were never married and never registered as domestic partners. Plaintiffs allege that Isaiah, age 8, Ivan, age 7, and Calah, age 4, are Sanchez and Armenta's children. Armenta is listed as the father on the birth certificates of Isaiah, Ivan, and Calah, and each child was born during Armenta's lifetime. Sanchez has only been married once. Sanchez married her husband, Robert Gonzales, on or around June 12, 2012, three years after the birth of her last alleged child with Armenta. There is no DNA evidence as to the paternity of Isaiah, Ivan, or Calah.

### B. Undisputed Facts Related to Plaintiffs' Claims

Kent Pichardo is an officer of the Fresno Police Department. At approximately 3:30PM on May 8, 2012, Pichardo was on patrol, in a marked patrol vehicle, and a full police uniform and located

near the intersection of McKinley and Peach in Fresno.  In the vicinity of McKinley and Peach, a female driver, Maria Delgado, notified Pichardo that she was driving westbound on Olive to turn northbound on Peach when a male attempted to open her car door and seemed like he was trying to carjack her.  Delgado described the man as white or Hispanic, wearing a black hat, white t-shirt, and in his 20's.  She appeared to be shaking in fear as she spoke to Pichardo.

Pichardo then drove to the vicinity of Peach and Olive to look for a person matching the description Delgado gave him.  Pichardo radioed to dispatch to ask whether there had been a call of a suspicious person in the area of Peach and Olive, and dispatch advised him that there were no suspicious calls.

Pichardo observed a male, later identified as Manuel Armenta, matching Delgado's description walking westbound on Olive west of Peach.  Armenta was also wearing a hat, sunglasses, and had a beard, none of which were included in Delgado's description.  Pichardo decided to observe Armenta further, so Pichardo parked slightly west of Armenta's location.  Pichardo observed Armenta sitting at a bus stop for approximately ten minutes.  Pichardo also observed an unknown female at the bus stop move away from Armenta.  The bus then came and remained stopped at the bus stop for what Pichardo considered to be an usually long period of time.  The unknown female apparently got on the bus.  When the bus pulled away, Armenta was still at the bus stop, and he began traveling back the way he came.

Pichardo observed a white car drive past Armenta into the driveway of an apartment complex and observed Armenta apparently following the car into the driveway of the apartment complex.  After parking his patrol vehicle at the apartment complex, Pichardo exited his vehicle.  As Pichardo exited his vehicle, Armenta walked a wide circle around him, apparently trying to avoid Pichardo.  At that point, Pichardo observed that Armenta's lips were extremely chapped and had white residue on his mouth.  Pichardo alleges he believed that Armenta was under the influence of drugs, likely methamphetamine.  Armenta stated to Pichardo that Armenta was not doing anything wrong.  Pichardo ordered Armenta to show Pichardo his hands.

Armenta took off running south across Olive.  Pichardo gave chase and ordered Armenta to stop and show his hands.  Armenta ran to the south side of Olive, stopped, and turned toward Pichardo.

3

Pichardo observed that Armenta had a screwdriver in his right hand. Pichardo notified dispatch that Armenta was armed with a screwdriver.

Armenta then took off running again. Pichardo gave chase again and ordered Armenta to drop the screwdriver. Armenta stopped in middle of Olive and turned toward Pichardo. Pichardo deployed his taser and fired two darts at Armenta. Armenta remained upright after being tasered. Pichardo then dropped his taser and drew his service weapon. Pichardo initially fired three shots at Armenta. At some point during this encounter, Pichardo tripped and fell on his rear. Pichardo fired a fourth shot at Armenta which he knew impacted Armenta in the center of his chest. Pichardo then fired a fifth and final shot at Armenta. After firing the fifth shot, Pichardo radioed that he fired shots and requested medical attention for Armenta.

### C. Procedural History

Plaintiffs brought this action for violation of § 1983, wrongful death, and negligence against Defendants in this Court on March 5, 2013. (Doc. 1). Defendants filed an answer on June 6, 2013. (Doc. 8).

On September 26, 2014, Defendants filed the instant motion for summary judgment as to Plaintiffs' standing to bring the complaint and as to the complaint in its entirety. (Doc. 56). Plaintiffs filed an opposition on October 22, 2014, and Defendants filed a reply on October 29, 2014. (Doc. 62, 65).

## DISCUSSION

## Motion for Summary Judgment

### A. Legal Standard

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidvits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law;

"irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the non-moving party's case. *Id.* When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson,* 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun,* 509 F.3d at 984.

**B.   Analysis**

Defendants seek summary adjudication as to the standing of each Plaintiff to bring the claims in the complaint. Defendants also seek summary adjudication as to each cause of action in the complaint.

   **1.   Standing**

The Ninth Circuit has held that, in § 1983 claims, the survivor of an individual killed as a result of an alleged constitutional violation may assert that § 1983 claim on the decedent's behalf if the relevant state's law authorizes that person to bring a wrongful death action. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (citing 42 U.S.C. § 1988(a)). Here, Cal. Civ. P.

Code § 377.60(a) provides, in relevant part, that "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by . . .[t]he decedent's surviving spouse, domestic partner, children, and issue of deceased children[.]"  Section 377.60(b) provides that, "[w]hether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents" of the decedent also may bring a wrongful death claim.  Cal. Civ. P. Code § 377.60(b).

### i. Fiona Raygoza

The evidence shows and the parties do not dispute that Raygoza was still married to Camacho at the time she married Armenta and that, as a result, Raygoza and Armenta's marriage was void *ab initio*.  Raygoza argues that she nonetheless has standing to bring her claims against Defendants because she is Armenta's surviving putative spouse.

Section 377.60(b) of the California Code of Civil Procedure further provides that "[a]s used in this subdivision, 'putative spouse' means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid."[1]

The California Supreme Court recently clarified the appropriate analysis for evaluating whether an alleged putative spouse meets the requirements of § 377.60(b).  The Court instructed as follows:

> The good faith inquiry is a subjective one that focuses on the actual state of mind of the alleged putative spouse. While there is no requirement that the claimed belief be objectively reasonable, good faith is a relative quality and depends on all the relevant circumstances, including objective circumstances. In determining good faith, the trial court must consider the totality of the circumstances, including the efforts made to create a valid marriage, the alleged putative spouse's personal background and experience, and all the circumstances surrounding the marriage. Although the claimed belief need not pass a reasonable person test, the reasonableness or unreasonableness of one's belief in the face of objective circumstances pointing to a marriage's invalidity is a factor properly considered as part of the totality of the circumstances in determining whether the belief was genuinely and honestly held.

*Ceja v. Rudolph & Sletten, Inc.*, 56 Cal. 4th 1113, 1128 (2013)

The evidence shows that Raygoza filed a petition for dissolution of her marriage to

---

[1] This is consistent with California Family Code § 2251(a), which also provides that, "[i]f a determination is made that a marriage is void or voidable and the court finds that either party or both parties believed in good faith that the marriage was valid, the court shall declare the party or parties to have the status of putative spouse."

6

Camacho. (Doc. 57 Exh. Z). Raygoza testified in her deposition that she was divorced from Camacho in July 2010. (Raygoza Dep. 20:8-10). She testified that the July 2010 date she gave for her divorce from Camacho was based on her date of separation from Camacho, which she listed as July 2, 2010 in the petition for dissolution. (Raygoza Dep. 21:13-19). Raygoza further testified that she filed the petition herself, and that the petition was filed on November 2, 2010. (Raygoza Dep. 21:24-22:8). She testified she "didn't know" that she was not yet divorced from Camacho when she filed the petition, and that "I just figured that as soon as I turned in these papers that I could just get remarried." (Raygoza Dep. 25:21-26:5). The evidence shows that, in the petition, which Raygoza signed and dated September 8, 2010 and filed on November 2, 2010, Raygoza listed Armenta as her "boyfriend." (Doc. 57 Exh. Z). Raygoza testified that she listed Armenta as her boyfriend instead of her husband on the petition because "I believe I wasn't married to him yet at the time" and "[p]robably because I wasn't used to it yet." (Raygoza Dep. 25:3-20).

Raygoza's beliefs as to the dates and sequence of events as to her divorce from Camacho and her marriage to Armenta seem logically inconsistent, if not just plain inconsistent. However, as the California Supreme Court instructed, the good faith inquiry in § 377.60(b) is a subjective inquiry, and there is no requirement that the claimed belief be objectively reasonable. *Ceja*, 56 Cal. 4th at 1128.

Instead, "[g]ood faith must be judged on a case-by-case basis in light of all the relevant facts, such as the efforts made to create a valid marriage, the alleged putative spouse's background and experience, and the circumstances surrounding the marriage, including any objective evidence of the marriage's invalidity." *Id*. at 1116. Plaintiffs argue Raygoza believed that, at the time of Armenta's death, she and Armenta were legally married. In support of this, Plaintiffs present undisputed evidence that she filed a petition for dissolution of her marriage with Camacho, that she and Armenta had a marriage ceremony, that they lived together as husband and wife following the ceremony, that he provided her with her with emotional support, including during her pregnancy, until his death, and that she expected a family with him. (Doc. 57 Exh. Z; Raygoza Dep.). This evidence shows the efforts Raygoza and Armenta made to create a valid marriage. *Ceja*, 56 Cal. 4th at 1116. As to Raygoza's background and experience, she testified that she and Armenta were homeless at the time of Armenta's death, that Armenta was her only support system, and that she was using methamphetamine, including

when she was pregnant with Armenta, Jr. (Raygoza Dep. 54:19-55:22; 139:9-140:17). Nothing in the record indicates that Raygoza possessed familiarity with the procedures of family court or a high level of sophistication generally. Finally, while the lack of a judgment of dissolution is objective evidence that Raygoza and Camacho were still married at the time Raygoza married Armenta, Raygoza's limited understanding of family law procedures and efforts in filing and serving a petition for dissolution of her marriage to Camacho affect the weight given to this objective evidence in evaluating Raygoza's subjective good faith belief.

Therefore, based on the facts and circumstances before the Court, Plaintiffs raise a genuine issue of material fact as to whether Raygoza possessed a good faith belief within the meaning of § 377.60(b) that she and Armenta were legally married at the time of his death. Accordingly, Defendants' motion for summary adjudication as to Raygoza's standing, as Armenta's putative spouse, to bring her claims is DENIED.

### ii. Manuel Armenta, Jr.

Defendants argue that Plaintiffs are unable to show Armenta, Jr. possesses standing to bring his claims because Armenta, Jr. was born six months after the death of Armenta and there is no DNA evidence as to Armenta, Jr.'s paternity.

However, the parties do not dispute that Armenta, Jr. is the son of Raygoza. In addition, while he was born six months after Armenta's death, the parties do not dispute that Armenta, Jr.'s conception took place during Armenta's lifetime. Plaintiffs also provide as evidence Armenta, Jr.'s birth certificate, which lists Armenta as his father. (Doc. 64 Exh. F). Defendants present no evidence to show that Armenta, Jr.'s birth certificate is inaccurate or fraudulent.

As discussed above, Cal. Code Civ. P. § 377.60(b) provides that, "[w]hether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, or parents" of the decedent also may bring a wrongful death claim. Because Plaintiffs raise a genuine issue of material fact as to whether Raygoza was Armenta's putative spouse at the time of his death, Plaintiffs also raise a genuine issue of material fact as to whether Armenta, Jr., as Raygoza's son, possesses standing to bring his claims under § 377.60(b). In addition, by showing that Armenta, Jr.'s mother was in a relationship with Armenta at the time of Armenta, Jr.'s

conception and that Armenta is listed as Armenta, Jr.'s father on Armenta, Jr.'s birth certificate, Plaintiffs raise a genuine issue of material fact as to whether Armenta, Jr. is the son of Armenta, and therefore has standing under § 377.60(a).  Accordingly, Defendant's motion for summary adjudication as to Armenta, Jr.'s standing, both as Raygoza's son and as Armenta's alleged offspring, to bring his claims is DENIED.

### iii.    Candelaria Sanchez's Children

Defendants move for summary adjudication as to the standing of Sanchez's children, Isaiah, Ivan, and Calah, to bring their claims against Defendants because Sanchez and Armenta were never married, never registered as domestic partners, Sanchez obtained a restraining order for her children against Armenta, and there is no DNA evidence as to the paternity of Sanchez's children. (Doc. 56 pp. 12-13).

Under California Family Code § 7611, a man is presumed to be the father of the child at issue if the man meets the conditions set forth in § 7570, *et seq*. *In re Levi H.*, 197 Cal. App. 4th 1279, 1286 (Cal. Ct. App. 2011).  The California Legislature enacted § 7570, *et seq*., to provide for the establishment of paternity by voluntary declaration.  *Id*.  Section 7571(a) provides as follows:

> On and after January 1, 1995, upon the event of a live birth, prior to an unmarried mother leaving any hospital, the person responsible for registering live births under Section 102405 of the Health and Safety Code shall provide to the natural mother and shall attempt to provide, at the place of birth, to the man identified by the natural mother as the natural father, a voluntary declaration of paternity together with the written materials described in Section 7572. Staff in the hospital shall witness the signatures of parents signing a voluntary declaration of paternity and shall forward the signed declaration to the Department of Child Support Services within 20 days of the date the declaration was signed. A copy of the declaration shall be made available to each of the attesting parents.

Cal. Fam. Code § 7571(a).

California courts have held that, because Health and Safety Code § 102425 prohibits listing an unmarried father on a child's birth certificate absent a signed voluntary declaration of paternity, an unmarried man's name on the child's birth certificate is "prima facie proof that he signed a voluntary declaration of paternity." *In re Raphael P.*, 97 Cal. App. 4th 716, 738 (Cal. Ct. App. 2002); *see also*, *In re D.T.*, No. A114531, 2007 WL 907116, at *5 (Cal. Ct. App. Mar. 27, 2007) ("Inclusion of the father's name on the birth certificate creates a presumption of compliance with these sections for the

purpose of establishing presumed father status under section 7611.") (citing *Raphael P.*, 97 Cal. App. 4th at 738). Isaiah, Ivan, and Calah were all born after 1995. (Sanchez Dep. 149:7-18). The parties agree that Sanchez and Armenta were never married, and there is no evidence that Armenta was married to someone else at the time of the children's births. Plaintiffs present undisputed evidence that Armenta was listed as the father on the birth certificates of Isaiah, Ivan, and Calah. (Doc. 64 Exhs. E, G, H). Therefore, Armenta appears to meet the conditions of Cal. Fam. Code § 7570, *et seq.*, to be presumed the father of Isaiah, Ivan, and Calah. Ca. Fam. Code § 7611.

Defendants point to Sanchez's deposition testimony where she stated that Armenta questioned whether Ivan was his child because Ivan was "dark" and Armenta's previous child with Sanchez, Isaiah, was "white," and Armenta expected Ivan to be "exactly like" Isaiah. (Sanchez Dep. 154:4-19). However, Sanchez also testified that, at the point, Armenta had not met any of Sanchez's family, and that her family is "all dark." *Id*. Sanchez further testified that Armenta did not suspect or accuse her of unfaithfulness. *Id*. Rather, Armenta's doubts were founded on Ivan's complexion as compared to that of Isaiah. *Id*. Defendants further point out that Sanchez obtained a restraining order for Isaiah, Ivan, and Calah against Armenta in 2010. (Doc. 57 Exh. BB). However, the restraining order on its own is unavailing – the issue here is whether Armenta was in fact the father of Isaiah, Ivan, and Calah, not whether Armenta was a good father.

Therefore, Plaintiffs raise a genuine issue of material fact as to whether Isaiah, Ivan, and Calah are Armenta's children. Accordingly, Defendants' motion for summary adjudication as to the standing of Isaiah, Ivan, and Calah to bring their claims against Defendants is DENIED.

### 2. Plaintiffs' Claims[2]

#### i. § 1983 Claims

In the first two causes of action, Plaintiffs allege that Defendants violated 42 U.S.C. § 1983 by using excessive force against Armenta under the Fourth Amendment and by depriving Plaintiffs of their familial relationships with Armenta as husband and father under the Fourteenth Amendment.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

---

[2] Plaintiffs in their opposition to Defendants' motion for summary judgment agree to voluntarily withdraw their claims against Defendant Jerry Dryer. (Doc. 62 p. 25).

vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)). Section 1983 and other federal civil rights statutes address liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Carey v. Piphus*, 435 U.S. 247, 253 (1978) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)).

"Section 1983 imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632–633 (9th Cir. 1988).

### 1. Fourth Amendment Excessive Force Claim

In the first cause of action, Raygoza, as the alleged putative spouse and successor in interest to Armenta, asserts that Defendants violated 42 U.S.C. § 1983 because Pichardo's use of force in shooting Armenta was excessive under the Fourth Amendment. (Compl. ¶¶ 18-21). Defendants argue that Pichardo's use of force was objectively reasonable and that Pichardo is entitled to qualified immunity. (Doc. 56 pp. 14-17).

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the United States Supreme Court determined that § 1983 excessive force claims, both for deadly and non-deadly force, are to be addressed under the Fourth Amendment's reasonableness standard. The Ninth Circuit has adopted *Graham* and explained the inquiry:

> We apply *Graham* by first considering the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001). As we have previously explained, "[t]hese factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'"

*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.2010); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "Ultimately the most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441 (internal quotation and citation omitted).

Moreover, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396–397 (internal quotations and citations omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003).

With this framework in mind, the Court turns to Plaintiffs' claims.

### a.  Reasonableness of Force Used

As both the Supreme Court and the Ninth Circuit have instructed, determining whether a specific use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted), *Mattos*, 661 F.3d at 441.

#### i.  Nature and Quality of the Intrusion

The amount of force Pichardo used against Armenta was great. The parties do not dispute that Pichardo fired his taser at Armenta, that Pichardo then fired five shots at Armenta from a distance of less than twenty-five feet, that at least one of the shots struck Armenta, and that Armenta died as a result. (Pichardo Dec. ¶¶15-16, 18; Pichardo Dep. pp. 68-69; Magana Dep. pp. 21-22, 31, 62-63[3]). This quantum of force must be measured against the *Graham* factors below.

#### ii.  Governmental Interests at Stake

In evaluating the governmental interests at stake, the Court follows the Ninth Circuit's analysis and considers the *Graham* factors of (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396–397, *Mattos*, 661 F.3d at 441.

As to the first *Graham* factor, the parties do not dispute that Pichardo noticed Armenta and

---

[3] Plaintiffs heavily rely on the testimony of eyewitness Ana Magana to dispute Defendants' factual assertions as to the encounter between Pichardo and Armenta.

12

took an interest in him because Armenta to some extent fit Delgado's description of a man who Delgado claimed tried to carjack her. (Pichardo Dec. ¶ 9). Defendants also allege that Pichardo believed Armenta was about to commit a carjacking after Pichardo observed Armenta sit at the bus stop for ten minutes, not get on the bus when it arrived, and then follow at a fast pace a white car that drove by. (Pichardo Dec. ¶¶ 9-11). Defendants do not present evidence to show that Pichardo actually observed Armenta commit any crime.

As to the third *Graham* factor, there is no evidence that Pichardo ever tried to arrest Armenta. Pichardo commanded Armenta to show Pichardo his hands, ordered Armenta to stop and gave chase when Armenta took off running twice, and commanded Armenta to "drop it" when Pichardo saw that Armenta was holding a screwdriver. (Pichardo Dec. ¶¶ 13-15).

Regarding the second *Graham* factor, the Ninth Circuit has stated that "[u]ltimately the most important *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others." *Mattos*, 661 F.3d at 441 (internal quotation and citation omitted). Evidence presented by both Plaintiffs and Defendants show that, from the perspective of a reasonable officer on the scene, Armenta presented an immediate threat to Pichardo's safety.

There is undisputed physical evidence that, throughout his encounter with Pichardo, Armenta possessed a sharpened screwdriver, and undisputed evidence that Pichardo observed Armenta holding the screwdriver, that Pichardo ordered Armenta to drop the screwdriver, and that Armenta did not drop the screwdriver. (Doc. 57 Exhs. H, I; Pichardo Dec. ¶ 14).

Defendants present evidence that, after the second time Armenta ran away from Pichardo, Armenta stopped, turned toward Pichardo, and advanced combatively toward him. (Pichardo Dec. ¶ 15). Plaintiffs dispute whether Armenta advanced on Pichardo and whether Armenta's demeanor was combative. (Doc. 63 pp. 28-29). However, the evidence presented by both Plaintiffs and Defendants show that Armenta advanced on Pichardo after he stopped running and that, at the time Pichardo tasered Armenta, Armenta behaved in a way that indicated he wanted to fight Pichardo. (Pichardo Decl. ¶ 15; Magana Dep. 20:12-21; 21:6-16; 45:6-9).

Defendants present evidence that, after Pichardo deployed his taser on Armenta, Armenta remained combative and continued to advance on Pichardo. (Pichardo Dec. ¶ 15). Plaintiffs dispute

Defendants' contention by pointing to Magana's deposition testimony that Armenta stepped "back and forth" after Pichardo tasered him. (Doc. 63 p. 30). However, Magana actually testified that, after Pichardo tasered Armenta, Armenta was stepping back and forth "like when people are fighting, you know, men are fighting," like a boxer would in a ring. (Magana Dep. 45:19-46:3). Evidence presented by both parties show that Armenta was advancing on Pichardo and that Armenta was about five to seven feet away from Pichardo when Pichardo deployed his taser. (Pichardo Dec. ¶ 16; Magana Dep. 53:4-9). Magana further testified that, after Pichardo tasered Armenta, and Pichardo fell to the ground, Armenta continued to advance on Pichardo "at a quick rate." (Magana Dep. 21:23-5). There is no evidence to show that the taser incapacitated Armenta to any extent or caused him to collapse. In fact, the evidence appears consistent with Pichardo's statement that the taser did not appear to have any visible effect on Armenta. (Pichardo Dec. ¶ 15; Magana Dep. 20:12-21).

As Armenta advanced on Pichardo, Pichardo ordered Armenta to stop. (Pichardo Dec. ¶ 16). This is consistent with Magana's testimony that she could see Pichardo's mouth moving. (Magana Dep. 15:23-16:4). Pichardo states that Armenta refused to stop and continued to advance on him. (Pichardo Dec. § 16). This is also consistent with Magana's testimony that Armenta stopped running, turned, and advanced toward Pichardo, and that Armenta continued to advance toward Pichardo as Pichardo tasered him and as Pichardo fell to the ground. (Magana Dep. 45:1-46:3, 55:3-9).

The parties agree that Pichardo then fired a total of five rounds at Armenta. Pichardo first fired a group of three rounds at Pichardo, then a fourth round, then a fifth round. (Pichardo Decl. ¶¶ 16-17). This is consistent with Magana's testimony that she heard three distinct shots. (Magana Dep. 55:14-16). Pichardo states that he fell backward onto his rear as he was firing the first group of three rounds. (Pichardo Dec. ¶ 16). Magana testified that Pichardo fell, got back up, and then fired the first group of shots at Armenta. (Magana Dep. 21:24-22:1). Evidence presented by both sides shows that Armenta was advancing on Pichardo, despite Pichardo's command to stop, and that Armenta was about four feet from Pichardo and closing when Pichardo fired the first group of shots at Armenta. (Pichardo Dec. ¶ 16; Magana Dep. 21:24-22:5; 53:17-22). In fact, Magana testified that she feared for Pichardo's safety based on Armenta's behavior:

> Q: Did it surprise you when the officer fell to the ground that the suspect continued to advance on the officer?
> A: It did because I was worried that he would do something to the officer.
> Q: What were you worried about?
> A: That he would attack him and I was hoping that there was other officers in the area.

(Magana Dep. 55:3-9). Both Plaintiffs' and Defendants' evidence also shows that Armenta continued to advance on Pichardo after the first group of shots, at the time Pichardo fired the fourth round. (Pichardo Dec. ¶ 16; Magana Dep. 53:17-24, 55:1-9). Pichardo states in his declaration that "[a]t the moment I fired the fourth round, I believed that Armenta's intent was to stab me with the screwdriver because, when I fell to the ground, he had the opportunity to run away but, instead, he decided to continue to engage me." (Pichardo Dec. ¶ 17). Plaintiffs present no evidence to show that Pichardo's interpretation of Armenta's behavior and fear for his safety were unreasonable or unfounded. Finally, both Plaintiffs and Defendants present evidence showing that Armenta was still standing until Pichardo fired the fifth and final round. (Pichardo Dec. ¶ 18; Magana Dep. 55:21-56:7). Pichardo states that Armenta continued to advance on him until he fired the fifth shot. (Pichardo Dec. ¶ 18). Magana testified that she does not recall whether Armenta was still advancing at the time Pichardo fired the final shot, but recalls that it took all of Pichardo's shots for Armenta to fall. (Magana Dep. 55:21-56:7).

While there are some inconsistencies between Pichardo's and Magana's accounts of the encounter between Pichardo and Armenta, both accounts and undisputed evidence show that, from the perspective of a reasonable officer on the scene, Armenta presented an immediate threat to Pichardo's safety. *Graham*, 490 U.S. at 396–397, *Mattos*, 661 F.3d at 441. The evidence shows that Armenta was armed with a screwdriver, that Armenta refused to drop the screwdriver or to stop advancing on Pichardo when Pichardo repeatedly ordered him to do so, that Armenta had extremely chapped lips and white residue on his lips and was unaffected by being tasered, that Armenta continued to advance combatively toward Pichardo after been tasered and after Pichardo fired the first group of rounds, and that Armenta did not appear incapacitated until Pichardo fired the fifth and final round. In fact, an eyewitness on whom Plaintiffs rely testified that she feared for Pichardo's safety because she thought Armenta may attack him. (Magana Dep. 55:3-9). In the Ninth Circuit, the presence of an immediate

threat to the safety of officers or others is "[u]ltimately the most important *Graham* factor[.]" *Mattos*, 661 F.3d at 441. Based on the evidence before the Court, this factor decisively weighs in favor of Pichardo's use of force against Armenta. *See*, *Graham*, 490 U.S. at 396 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Plaintiffs fail to set forth evidence to raise a genuine dispute of material fact as to whether Pichardo's use of force against Armenta was reasonable.

Accordingly, Defendants' motion for summary adjudication as to Plaintiffs' first cause of action against Pichardo for excessive force under the Fourth Amendment in violation of 42 U.S.C. § 1983 is GRANTED.

### 2. Fourteenth Amendment Substantive Due Process Claim

In the second cause of action, Plaintiffs allege that Defendants deprived them of their Fourteenth Amendment liberty interest in their familial relationships Armenta as father and spouse in violation of 42 U.S.C. § 1983.

"Substantive due process protects individuals from arbitrary deprivation of their liberty by the government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-49 (1998)). To be considered arbitrary in a constitutional sense, the conduct at issue must be "only the most egregious official conduct" or "executive abuse of power [that] shocks the conscience" such as conduct "intended to injure in some way unjustifiable by any government interest." *Id*. "Substantive due process is ordinarily reserved for those rights that are 'fundamental.'" *Id*. at 990 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997)).

The Ninth Circuit has recognized that family members have a liberty interest in their companionship with one another such that a state actor's interference with it may constitute a violation of procedural or substantive due process rights. *Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir. 1987) (overruled on other grounds by *Hodger-Durgin v. De La Fina*, 199 F.3d 1037 (9th Cir. 1999)); *see also*, *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985).

However, as Plaintiffs fail to raise a genuine issue of material fact as to whether Pichardo's use of force against Armenta which resulted in Armenta's death was reasonable, Plaintiffs cannot show

that Pichardo's conduct engaged in "the most egregious official conduct" or an "abuse of power [that] shocks the conscience[.]" *Brittain*, 451 F.3d at 991.  Therefore, Plaintiffs cannot show that Defendants arbitrarily deprived them of their liberty interest in their familial relationships with Armenta. *Id*.

Accordingly, Defendants' motion for summary adjudication as to Plaintiffs' second cause of action against Pichardo for deprivation of liberty interest in familial relationships under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 is GRANTED.

### 3. Qualified Immunity

The doctrine of qualified immunity shields public officials from liability for civil damages, so long as their conduct does not violate clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Determining whether an official is entitled to qualified immunity entails a two-pronged analysis: (1) whether the facts as alleged show the official's conduct violated a constitutional right; and (2) whether it would be sufficiently clear to a reasonable official that his conduct was unconstitutional in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

Because Plaintiffs fail to raise a genuine issue of material fact as to whether Pichardo's use of force was reasonable and as to whether Pichardo arbitrary deprived them of their familial relationships, they likewise fail to raise a genuine issue of material fact as to whether Pichardo violated clearly established constitutional rights.

Accordingly, based on the evidence before the Court, Pichardo's conduct is protected by qualified immunity.

### 4. *Monell* Claim against the City

Plaintiffs also bring their first two causes of action against Defendant the City of Fresno.

Municipalities and local governments can be liable for damages under Section 1983 when "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978).  Local governments are not liable, however, for simply employing a tortfeasor. *Id.* at 694–95 ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is

1  responsible under § 1983.").

2  A government entity may be liable under Section 1983 claim if a policy, practice, or custom
3  of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty*
4  *v. City of Covina,* 654 F.3d 892, 900 (9th Cir. 2011); *see also*, *Price v. Sery,* 513 F.3d 962, 966 (9th
5  Cir. 2008) (discussing the four ways to demonstrate a municipal policy or custom).

6  As discussed above, Plaintiffs fail to raise a genuine issue of material fact as to whether
7  Pichardo violated Pichardo's right to be free from excessive force under the Fourth Amendment or
8  whether Pichardo violated Plaintiffs' right to be free from unreasonable state interference in their
9  familial relationships under the Fourteenth Amendment. Plaintiffs present no evidence that Pichardo
10 or any other City employee committed any other constitutional violation against them. Therefore,
11 Plaintiffs cannot succeed on their *Monell* claims against the City. *See City of Los Angeles v. Heller*,
12 475 U.S. 796, 799 (1986) ("[N]either *Monell* ... nor any of our cases authorizes the award of damages
13 against a municipal corporation based on the actions of one of its officers when in fact ... the officer
14 inflicted no constitutional harm.").

15 Accordingly, Defendants' motion for summary adjudication as to Plaintiffs' first and second
16 causes of action against the City of Fresno is GRANTED.

17                **ii.     State Law Claims**

18 In their third and fourth causes of action, Plaintiffs bring claims for wrongful death and
19 negligence under California law against Defendants.

20 Plaintiffs brought this action in this Court presumably on the basis of federal question
21 jurisdiction over Plaintiffs' first two causes of action under 42 U.S.C. § 1983.

22 Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental
23 jurisdiction over a claim where the district court has dismissed all claims over which it has original
24 jurisdiction. As discussed above, this Court grants Defendants' motion for summary adjudication as to
25 both of Plaintiffs' federal causes of action. Moreover, as this Court routinely advises counsel, this
26 Court carries the heaviest caseload in the nation. *See*, Preliminary Statement, *supra*. Therefore, there
27 is no reason for this Court to expend its limited resources to adjudicate claims that are purely a matter
28 of state law when no federal claims remain.

Accordingly, this Court DECLINES to exercise supplemental jurisdiction over Plaintiffs' third and fourth causes of action and DISMISSES them without prejudice.

**CONCLUSION AND ORDER**

For the reasons discussed above, the Court:

1. DENIES Defendants' motion for summary adjudication as to the standing of Plaintiffs Fiona Raygoza, Manuel Armenta, Jr., Isaiah Armenta, Ivan Armenta, and Calah Armenta to bring their complaint against Defendants the City of Fresno, Jerry Dyer, and Kent Pichardo;

2. DISMISSES Jerry Dyer as a Defendant in this action upon Plaintiffs' agreement;

3. GRANTS Defendants' motion for summary adjudication as to Plaintiffs' first and second causes of action against Defendants for violations of 42 U.S.C. § 1983;

4. DECLINES to exercise supplemental jurisdiction over and DISMISSES without prejudice Plaintiffs' third cause of action for wrongful death and fourth cause of action for negligence against Defendants; and

5. ORDERS the Clerk of Court to enter judgment in favor of Defendants the City of Fresno, Jerry Dyer, and Kent Pichardo, against Plaintiffs Fiona Raygoza, Manuel Armenta, Jr., Isaiah Armenta, Ivan Armenta, and Calah Armenta, and to close this case.

If Plaintiffs wish to re-file their third cause of action for wrongful death and fourth cause of action for negligence against Defendants, they must do so **in state court**.

**SO ORDERED**
**Dated: December 9, 2014**

　　　　　　　　　　　　　　　　　　　　　**/s/ Lawrence J. O'Neill**
　　　　　　　　　　　　　　　　　　　　　**United States District Judge**